**Bill WILKINSON and James Farrands**

**v.**

**Lester FORST, Commissioner of Public Safety for the State of Connecticut at certain times relevant hereto, individually and in his official capacity; Donald Long, Commissioner of Public Safety for the State of Connecticut at certain times relevant hereto, individually and in his official capacity and Austin McGuigan, Chief State's Attorney for the State of Connecticut at all times relevant hereto, in his official capacity; and the City of Meriden.**

**Civ. No. H–80–755(JAC).**

United States District Court,
D. Connecticut.

June 30, 1986.

Matthew Horowitz, Springfield, Mass., Shelley White, Hartford, Conn., for plaintiffs.

Stephen J. O'Neill, Richard T. Biggar, Office of the Atty. Gen., James J. Szerejko, Hartford, Conn., for defendants Forst and Long.

Scott J. Murphy, Carl Schuman, Office of Chief State's Atty., Wallingford, Conn., for defendants McGuigan and City of Meriden.

## MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

### I. Introduction

The venerable Justice Oliver Wendell Holmes observed more than a half-century ago that "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate."[1] It has since been recognized in many difficult circumstances that "[f]reedom of thought carries with it the freedom to speak freely and to publicly assemble to express one's thoughts."[2]

These fundamental principles of American constitutional law must guide the court in resolving the important issue raised in this litigation—namely, whether the stopping and searching of all persons attending political rallies sponsored by the Invisible Empire Knights of the Ku Klux Klan ("the Klan") in the State of Connecti-cut infringe rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution.

It is useful at the outset to take note of those matters that are *not* at issue in this litigation. Most importantly, this lawsuit does not concern the merits of the political philosophy espoused by the Klan or by those organizations that have vehemently protested the Klan's presence in the State of Connecticut and sought to interfere with the public expression of the Klan's views. Indeed, the court could not decide this case on the basis of its approval or disapproval of the political views held by one or more of the parties, for, as the Supreme Court has instructed, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."[3]

Another matter not at issue in this case is whether law-enforcement officials may take all reasonable measures to maintain order at political rallies. This lawsuit does not challenge the ability of law-enforcement officials to designate the sites where Klan rallies may occur or to separate Klan and anti-Klan factions at those rallies.

The lawsuit likewise does not challenge the ability of the state to ban weapons and other dangerous instruments from rally sites and to enforce such a ban through the use of traditional law-enforcement techniques, including searches of persons and automobiles predicated on individualized suspicion of dangerousness or wrongdoing.

Finally, the lawsuit does not challenge the ability of law-enforcement officials to halt a rally if violence erupts or appears imminent and to arrest persons who refuse to disperse as ordered.

Instead, the sole issue in this lawsuit is whether the police violate constitutional rights when they stop and search all persons attending rallies of an unpopular polit-

1. *United States v. Schwimmer,* 279 U.S. 644, 654–655 (1929) (Holmes, J., dissenting).

2. *Collin v. Smith,* 447 F.Supp. 676, 702 (N.D.Ill. 1978), aff'd, 578 F.2d 1197 (7th Cir.), cert. de-nied, 439 U.S. 916 (1978). *See also Hague v. C.I.O.,* 307 U.S. 496 (1939).

3. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340 (1974).

ical group—and sometimes their automobiles as well—without having any reason to suspect that those particular persons are carrying weapons or other dangerous instruments.

For the reasons stated below, the court holds that the indiscriminate searching of persons and automobiles at Klan rallies violates the plaintiffs' right under the Fourth Amendment to be free from "unreasonable searches and seizures." The court reaches this conclusion after engaging in the "balancing of the need for the particular search against the invasion of personal rights that the search entails"[4] that has been required by the United States Supreme Court. Accordingly, the plaintiffs' prayer for declaratory and injunctive relief and nominal damages is granted; the defendants shall be enjoined from conducting similar mass searches at future Klan rallies and shall pay $1 in nominal damages to each of the plaintiffs.

## II. Findings of Fact

The plaintiffs in this action are current or former Klan officers who contend that the searching of all persons who attend Klan rallies in the State of Connecticut infringes their rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. The defendants are the current and former Commissioners of Public Safety for the State of Connecticut, the former Chief State's Attorney, and the City of Meriden, Connecticut.[5]

The Klan conducted sixteen rallies in the State of Connecticut between September 13, 1980 and April 30, 1984.[6] These were the first Klan rallies to take place in New England in approximately fifty years.[7] Twelve of the rallies occurred in public areas such as streets, sidewalks and parks, while four of the rallies took place on private property.[8] These rallies were designed to communicate the Klan's purposes, goals and ideas to the public and to recruit new members for the Klan; some of the rallies had specific themes such as support for local police departments, opposition to racial integration, and support for the launching of a nuclear submarine.[9]

The rallies ranged in size from the Meriden event of March 20, 1982 ("Meriden III"), which attracted approximately twenty Klan members and 2,000 spectators, to the New Britain event of April 29, 1984 ("New Britain II"), which attracted approximately twenty Klan members, six to eight spectators and twenty-five members of the

---

4. *Bell v. Wolfish,* 441 U.S. 520, 559 (1979).

5. Defendants Forst and Long are sued in both their individual and official capacities; defendant McGuigan is sued only in his official capacity.

6. The following chart sets forth the city or town in which each rally occurred, the date of each rally, and whether the rally was conducted on public or private property:

| Location | Date | Public/Private |
|---|---|---|
| Scotland | Sept. 13–14, 1980 | Private |
| Meriden I | March 21, 1981 | Public |
| Meriden II | July 11, 1981 | Public |
| Windham | Oct. 10–11, 1981 | Private |
| Meriden III | March 20, 1982 | Public |
| Danbury | Aug. 7–8, 1982 | Private |
| Norwich | Aug. 11, 1982 | Public |
| Canterbury | Aug. 14, 1982 | Private |
| Meriden IV | April 30, 1983 | Public |
| New Britain I | June 25, 1983 | Public |
| Stratford | Sept. 10, 1983 | Public |
| Groton I | Oct. 15, 1983 | Public |

| Location | Date | Public/Private |
|---|---|---|
| Wallingford | April 28, 1984 | Public |
| West Haven | April 28, 1984 | Public |
| New Britain II | April 29, 1984 | Public |
| Groton II | April 29, 1984 | Public |

Stipulation of Facts ("Stip.") contained in Final Pretrial Order (entered May 28, 1985) 5. The Klan also conducted rallies in East Windsor and New London on October 6, 1984, and in Meriden on October 7, 1984. However, the parties agreed to present no evidence at trial concerning any rally that occurred after April 30, 1984, other than evidence bearing on the issue of the plaintiffs' standing to maintain this action.

7. Certified Official Transcript of Trial (filed June 18, 1986) ("Tr.") 842.

8. *See* Note 7, *supra.*

9. Tr. 587–588, 672–673. Exhibits 35, 91, 109, 117, 124, 133, 164, 173, 181.

news media.[10] Only five of the sixteen rallies drew crowd in excess of 500 persons.[11] No more than thirty-five Klan members attended any of the rallies.[12]

Plaintiff Wilkinson, who was the chief executive officer of the national Invisible Empire Knights of the Ku Klux Klan from 1976 to 1984, has attended thirteen Klan rallies in Connecticut.[13] Plaintiff Farrands, who has been the chief executive officer of the Connecticut chapter of the Klan since 1981, has attended every Klan rally held in Connecticut.[14] The plaintiffs participated in these rallies in order to recruit new members for the Klan, to associate with persons of similar views, and to maximize the influence of the Klan on the political process.[15]

State or local law-enforcement officials in Connecticut have frequently sought court orders prohibiting the possession of weapons by persons attending Klan rallies.[16] The orders were obtained prior to thirteen of the fourteen rallies for which they were sought.[17] The orders typically enjoined the possession of "firearm[s] or other dangerous weapons on one's person or in an automobile" within a given distance of the rally site.[18] All but the first of these orders authorized the Connecticut State Police and local police departments to stop persons approaching the rally, to question them concerning their possession of weapons, and "where appropriate to perform frisks" of those persons.[19]

The central fact of this lawsuit is not disputed: All or virtually all persons were stopped and searched by state or local police officers [20] before they could enter the sites of the rallies for which court orders

---

**10.** Stip. 13p, 13q, 23r; Defendants' Proposed Findings of Facts and Conclusions of Law (filed Oct. 11, 1985) ("Defendant's Findings of Fact") ¶ 10.

**11.** Stip. 9o, 9p, 9q, 10f, 11d, 13p, 17o; Defendant's Findings of Fact ¶ 10.

**12.** Stip. 9o, 10d, 11d, 12o, 13q, 16f, 17n, 18k, 19k, 20n, 21o, 22s, 23r, 24r; Defendant's Findings of Fact ¶ 10.

**13.** Tr. 585–586; Stip. 9m, 10L, 12z, 13y, 14v, 15t, 16q, 175, 18r, 21m, 22n, 23m, 24o.

**14.** Tr. 671; Stip. 9m, 10L, 11k, 12z, 13y, 14v, 15t, 16q, 17t, 18r, 19n, 20r, 21m, 22n, 23m, 24o.

**15.** Tr. 587, 672.

**16.** Stip. 6, 7, 9a, 12c, 13c, 14c, 15d, 16a, 17c, 18b, 19c, 20d, 21b, 22c, 23b, 24d. The court orders often were not sought until a few days before the rally was to take place. For example, the defendants filed suit in the state Superior Court on October 7, 1981, to seek an order with respect to the Windham rally scheduled for October 10 and 11, 1981. Stip. 12c. They filed suit on August 11, 1982, to seek an order with respect to the Canterbury rally scheduled for August 14, 1982. Stip. 16a.

**17.** Stip. 9c, 12g, 13h, 14g, 15g, 16c, 17e, 18f, 19e, 20g, 21f, 22h, 23f, 24i. A court order was denied by the state Superior Court with respect to the Centerbury rally. However, the state police effectively circumvented the state court's decision by setting up motor vehicle spot checks in the vicinity of the rally site; officers of the state police stopped vehicles heading toward and away from the rally, checked drivers' licenses and car registrations, and inspected the vehicles for mechanical defects. Tr. 1603–1606; Stip. 16k, 16o, 16r. The police also asked plaintiff Farrands to open the trunk of his car, which he agreed to do. Tr. 686–687.

**18.** Exhibits 14, 42, 70, 80, 95, 111, 120, 131, 143, 150, 161, 176, 202. Several of the later orders enjoined the possession of "firearm[s] or other dangerous weapons *or instruments*" at the rallies. (emphasis supplied)

**19.** *Id.* Only two of the court orders did not utilize the quoted language. The Scotland order made no reference to searches. Exhibit 14. The West Haven order stated that "[t]hose who choose to enter the designated area will be subject to examination by means of metal detector, questioned concerning their possession of weapons, and where appropriate, a frisk for weapons will be performed." Exhibit 150. The Groton II order stated that automobiles as well as persons could be subject to search. Exhibit 202.

**20.** Officers of the Connecticut State Police participated in the searches of persons or automobiles, or both, at all but three of the rallies at issue in this lawsuit. Tr. 840, 1153, 1156, 1157, 1160, 1161–1162, 1166–1170, 1509–1510, 1519–1520, 1556, 1573–1574, 1602–1603, 1685–1686, 1690–1691. At one of the remaining rallies, the state police were stationed at entrances to oversee search operations; the state police were also present at the other two rallies to assist the local police in maintaining order. Tr. 1156, 1160, 1161–1162. State police and police of the City of Meriden searched persons attending the Meriden III and Meriden IV rallies. Tr. 1153, 1651.

had been obtained.[21] The searches were performed without regard to whether the persons were suspected of carrying weapons. It is likewise not controverted that all cars entering the rallies conducted on private property were stopped and searched.[22] Cars carrying Klan members to some of the rallies on public property were also stopped and searched; however, cars carrying persons other than Klan members were not searched on these occasions.[23] Plaintiff Wilkinson was searched at eleven of the rallies;[24] plaintiff Farrands was searched at fourteen rallies,[25] and his car was searched at ten rallies.[26]

The intensity of the searches performed on persons and automobiles has varied substantially from rally to rally. At most rallies, persons were subjected to a pat-down search, and pocketbooks and similar items were examined for weapons.[27] At some rallies, persons were also required to empty their pockets, roll up their trousers, remove their shoes, and reveal the contents of their wallets.[28] Persons were sometimes searched more than once at a single rally for no apparent reason.[29] Some of those attending the West Haven and Norwich rallies were searched first by hand-held magnetometers and then, if they triggered the magnetometer, were subjected to a pat-down search; those who triggered a magnetometer were frisked without having an opportunity to empty their pockets of metal objects and then to be reexamined by the magnetometer.[30] Police officers at some rallies searched under the hoods of cars and inside passenger compartments, glove compartments, trunks, air filters, hubcaps and closed containers found in the cars.[31]

The police confiscated any items that they considered dangerous and returned those items to their owners sometime after the rally.[32] These items ranged from rocks, knives and baseball bats to cameras, credit cards, change purses and an apple.[33] Most of these items were found in vehicles rather than on the persons of those attending the rallies.[34] Firearms were confiscated at only two of the rallies.[35]

The searches of persons and automobiles caused substantial annoyance and embarrassment to the plaintiffs and others who attended the Klan rallies.[36] The searches have deterred many persons from attending the rallies,[37] as both participants and law-enforcement officials have recognized,

21. Stip. 9h, 9i, 12k, 12L, 13m, 13n, 13o, 14L, 14m, 14n, 15c, 15n, 17j, 17k, 17L, 18n, 18o, 18s, 19i, 20L, 21j, 21k, 22L, 23L, 24m. Anti-Klan factions often did not submit to searches but instead remained immediately outside the rally entrances. It therefore appears that the searches alone could have done little to prevent violence between Klan and anti-Klan forces outside rally perimeters and, indeed, could not have prevented an anti-Klan demonstrator from firing a shot into the rally.

22. Stip. 9h, 9j, 12m, 14L, 14m, 14n.

23. Stip. 18s, 19h, 20L, 21n, 22r, 23o, 24n; Tr. 682–683.

24. Stip. 9n, 12aa, 13z, 14w, 15u, 17u, 18s, 21n, 22p, 22q, 23p, 24p.

25. Stip. 9n, 11f, 12aa, 13z, 14w, 15u, 17u, 18s, 19h, 20L, 20r, 21n, 22p, 22q, 23p, 24p.

26. Stip 9n, 12aa, 14w, 18s, 19h, 20L, 21n, 22r, 23o, 24q.

27. Stip. 9n, 11f, 12L, 13n, 14m, 14w, 15n, 17k, 17u, 18n, 19i, 20L, 21n, 22L, 22p, 23L, 23p, 24m, 24n, 24u.

28. Tr. 140–141, 592, 611, 677, 699–701.

29. Tr. 601, 603, 611, 652, 677, 681–684.

30. Tr. 300–301; Stip. 15n, 21j, 21k.

31. Tr. 205, 232–233, 601–602, 679–680.

32. Stip 12t, 21L, 22L, 23L.

33. Exhibits 17, 21, 48, 49, 50, 89, 112, 115, 165, 237.

34. Stip. 12t; Tr. 1608.

35. In one case, the firearms were owned by the family on whose property the rally took place. Stip 14x; Tr. 255–257, 606; Exhibits 78, 100. In the other case, the owners of the firearms may have been unaware of the court order entered the previous day that nullified their otherwise valid weapons permits. Tr. 1629.

36. Tr. 46, 268, 616, 689, 766.

37. Tr. 268–269, 564, 763–764, 1670; Exhibits 55, 73, 109, 128, 149, 157, 164, 174, 214, 237, 239.

and would likely deter many more from attending similar rallies in the future.

The initial Klan rally in Connecticut occurred approximately one year after the killing of several persons during a confrontation between Klan and anti-Klan forces in Greensboro, North Carolina. It was uncontroverted at trial that the circumstances of the Greensboro incident were significantly different from the circumstances of any of the Klan rallies held in Connecticut. For example, the Greensboro violence occurred in the absence of any law-enforcement officers,[38] and the pro- and anti-Klan groups at Greensboro were not the same groups that participated in the Connecticut rallies.[39]

Physical confrontations occurred at the first three Klan rallies held in Connecticut. These were the Scotland rally of September 13–14, 1980; the Meriden rally of March 21, 1981 ("Meriden I"), and the Meriden rally of July 11, 1981 ("Meriden II").[40] The injuries sustained at these rallies were caused by objects such as fists, rocks and bottles rather than by firearms, knives, clubs or other such weapons.[41] These injuries occurred despite the searching of all persons and cars attending the Scotland rally and the searching of all Klan members who attended the Meriden II rally.[42]

Klan members did not initiate or participate in any of these confrontations[43] and generally have cooperated with law-enforcement officials in planning and conducting their rallies.[44] Indeed, according

to the Connecticut State Police, the security threat at Klan rallies is posed not by the Klan but rather by certain anti-Klan groups.[45]

The plaintiffs' expert witness, Robert Klotz, the retired Deputy Chief of the Washington, D.C., Police Department and Commander of the Special Operations Division that handled all parades, rallies and demonstrations in that city of parades, rallies and demonstrations,[46] testified credibly that violence occurred at the early Klan rallies because state and local police officers failed to use appropriate crowd-control techniques.

For example, an insufficient number of police officers were assigned to these rallies, and many of the officers who were present were deployed in the wrong locations. Only 50 police officers were present at the Meriden I rally to control a crowd of 21 Klan members and 1,500 to 2,000 spectators, including anti-Klan demonstrators;[47] in contrast, at the Meriden III rally, where no violence occurred, 247 police officers were assigned to control a crowd of approximately 20 Klan members and 2,000 spectators,[48] and at the similarly non-violent Meriden IV rally on April 30, 1983, 317 police officers were assigned to control a crowd of approximately 25 Klan members and 1,000 spectators.[49] Furthermore, the police failed to clear the sites of the early rallies of rocks, bottles and other potential

**38.** Tr. 133, 369–370, 1120.

**39.** Tr. 807–808, 1121.

**40.** Tr. 175–176, 819, 1052–1053, 1062–1063; Exhibit 46; Stip. 9K, 10h, 11h.

**41.** Tr. 176, 819, 1052–1053, 1062–1063.

**42.** Tr. 149–156, 564–576; Stip. 9i, 9j, 11f.

**43.** Tr. 149–150; 1052; Exhibits 101, 130.

**44.** Exhibits 39, 55, 94, 106, 112, 121, 130, 146, 214, 217, 160 at 38–39.

**45.** Tr. 134–139, 1050–1052, 1677, 1683; Exhibits 39, 55, 72, 101, 130, 214, 246.

**46.** It is true that Chief Klotz gained most of his quarter-century of crowd-control experience in Washington, D.C., and not in Connecticut.

However, his experience, which far exceeds the experience of any of the defendants' witnesses both quantitatively and qualitatively, is highly relevant to the issues presented in this case. *See* Tr. 91–105. For example, Chief Klotz was responsible for the police response to a number of potentially explosive demonstrations in the nation's capital involving, for example, Iranian students at the time of the hostage crisis and members of the Palestine Liberation Organization at the time of the signing of the Israeli-Egyptian peace treaty.

**47.** Tr. 370; Stip. 10d, 10e, 10f, 10g.

**48.** Stip. 13p, 13q, 13s, 13aa.

**49.** Stip. 13p, 13q, 13r, 13s, 13t, 13aa.

projectiles before the participants arrived, and then properly to separate the Klan supporters from the anti-Klan demonstrators.[50]

These deficiencies in crowd control were acknowledged at trial by members of the Connecticut State Police, who explained that they had had no previous experience or training in maintaining order at such demonstrations.[51]

Police performance improved markedly at the thirteen rallies that followed Meriden II.[52] Few injuries were sustained at these later rallies, and order was maintained despite the frequent presence of anti-Klan demonstrators.[53] The court credits the expert opinion of Chief Klotz that the ability of the police to maintain order at the later rallies was attributable not to their indiscriminate searches of persons and automobiles at those rallies, but rather to a stronger and more visible police presence, to a greater mastery of traditional crowd-control techniques by both state and local law-enforcement officials, and to the use of such practices as requiring rallies to be held at sites (such as athletic fields in public parks) where security could more easily be assured, separating Klan forces from anti-Klan forces by restricting each group to designated areas at the rally sites, and removing from the rally sites debris such as rocks and bottles that could be used to inflict injuries.[54] The court likewise credits the expert opinion of Chief Klotz that the indiscriminate searches of persons and automobiles were not necessary or even particularly helpful in preventing violence at Klan rallies, and that order could have been maintained at the rallies through the use of the other crowd-control techniques that already had been adopted by Connecticut law-enforcement officials.[55]

It appears that the Klan intends to conduct additional rallies in Connecticut and that the plaintiffs plan to participate in those rallies.[56] In the event that any such rally is announced, the defendants can be expected to seek court orders similar to those obtained prior to previous rallies and to search all persons attending the rally.

### III.  Conclusions of Law [57]

#### A.  The Fourth Amendment Challenge

■ The court turns first to the plaintiffs' contention that the mass searches of persons and automobiles at Klan rallies in the State of Connecticut violated their rights under the Fourth Amendment to the United States Constitution.

The Fourth Amendment prohibits "unreasonable searches and seizures" of persons and their property "in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 653–654, 99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660 (1979). The Supreme Court has recognized that the test of the "reasonableness" of a search under the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of

---

**50.** Tr. 149–157, 165–174, 187–192, 370.

**51.** Tr. 863–864, 1064–1065, 1082–1083, 1111–1113, 1132–1133, 1529, 1607, 1662–1664, 1695.

**52.** Tr. 128–132, 170–171, 185–192, 220–225, 227–228, 264–265, 282–283, 295–296, 308, 1064–1067, 1132–1134.

**53.** Stip. 12r, 12s, 13s, 13t, 14p, 14q, 15p, 16h, 17q, 18q, 19L, 20q, 21q, 22t, 24t; Exhibit 160.

**54.** Tr. 128–132, 220–228, 241–259, 264–266, 270–272, 280–281, 286–287, 291–293, 295–296, 302–303, 304–305.

**55.** Tr. 132, 210, 227–228, 241–242, 275–276, 279–280, 281, 287–288, 293, 296, 302–304, 308, 369–370.

**56.** Tr. 587.

**57.** Defendant McGuigan previously moved to dismiss on the grounds that plaintiff Wilkinson (then the sole plaintiff) lacked standing to maintain the action, that the action was moot, and that the action was not ripe for decision; McGuigan simultaneously moved for summary judgment, contending that there were no disputed issues of material fact and that he was entitled to judgment as a matter of law. The court denied these motions in a ruling entered July 11, 1984, and reported at 591 F.Supp. 403 (D.Conn.1984).

personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Among the factors that the court must consider in undertaking this inquiry are "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* The court will proceed to consider each of these factors.

### 1. *The need or justification for the searches*

The purpose of the searches at issue in this lawsuit was to prevent outbreaks of violence at Klan rallies. It cannot be denied that the maintenance of order at public gatherings is a legitimate and important purpose.

One factor to be considered by the court in assessing the need for a particular search, however, is whether the purpose of the search could have been achieved by less intrusive means.[58] *See, e.g., Blackburn v. Snow*, 771 F.2d 556, 566 n. 6 (1st Cir.1985) (holding that suspicionless searches of all jail visitors could not be sustained absent a close relationship between the searches and their asserted purpose); *see also United States v. Oyekan*, 786 F.2d 832, 838 (8th Cir.1986) (indications that searches of alleged drug smugglers were performed "by the least intrusive means possible" were "important considerations in weighing 'the level of insult to personal privacy visited upon the victim of a search'").

This court has found, based on the expert testimony of Chief Klotz and the other evidence presented at trial, that mass searches of persons and automobiles are not necessary or even particularly helpful in preventing violence at Klan rallies in Connecticut. *See* Findings of Fact, *supra,* at notes 53–56 and accompanying text. Instead, the court has found that state and local law-enforcement officials have, since at least the time of the fifth Klan rally on March 20, 1982, employed other, less intrusive measures that will be sufficient in themselves to preserve order at Klan rallies without resort to indiscriminate searches of persons and automobiles. *Id.* These measures include the deployment of an adequate number of law-enforcement officers, the mastery of traditional crowd-control techniques, which necessarily include the ability to conduct a frisk for weapons whenever there are "specific and articulable" facts to support a reasonable belief that a particular individual poses a threat to the public safety, *see Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1967) ("*Terry*"), and the use of reasonable time, place and manner restrictions that may require, for example, that rallies be held at sites where security can more easily be assured and that Klan forces be separated from anti-Klan forces at the rallies. *See Findings of Fact, supra,* at note 5 and accompanying text.

In sum, the court finds that the mass searches of persons and automobiles undertaken by the defendants do not bear a close relationship to the important purpose of maintaining order at Klan rallies. Accordingly, the court holds that the need for the searches at issue in this lawsuit is not particularly substantial.

### 2. *The scope of the intrusion and the manner in which it was conducted*

The Supreme Court has repeatedly held that "even a limited search of the person is a substantial invasion of privacy." *New*

---

**58.** Our Court of Appeals has previously suggested that a search may be held unreasonable under the Fourth Amendment simply because the government failed to employ the least restrictive means available. *See, e.g., United States v. Albarado*, 495 F.2d 799, 806 (2d Cir. 1974) ("it is, and indeed for the preservation of a free society must be, *a constitutional requirement that to be reasonable the search must be as limited as possible commensurate with the performance of its functions*" [emphasis in original] ). This holding appears to be inconsistent with the Supreme Court's decisions in cases such as *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (holding that "[t]he reasonableness of any particular government activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means"). However, consideration of the alternative means that might have been employed by the defendants as *one factor* in the "reasonableness" analysis is fully consistent with the decisions of the Supreme Court and our Court of Appeals.

*Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985), *citing Terry, supra,* 392 U.S. at 24–25, 88 S.Ct. at 1881, 20 L.Ed.2d 889 (1967). Indeed, as the Court recognized in *Terry,*

> it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a "search." Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

392 U.S. at 16–17, 88 S.Ct. at 1877.

The Supreme Court has similarly held that "searches of closed items of personal luggage [such as pocketbooks and briefcases] are intrusions on protected privacy interests," *New Jersey v. T.L.O., supra,* 105 S.Ct. at 741, *citing United States v. Ross,* 456 U.S. 798, 822–823, 102 S.Ct. 2157, 2171–2172, 72 L.Ed.2d 572 (1982), and that even the search of an automobile is "a substantial invasion of privacy." *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975). *See also Delaware v. Prouse, supra,* 440 U.S. at 662–663, 99 S.Ct. at 1401 ("Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.").

The defendants have pointed to no decisions of the lower federal courts, except for decisions concerning prisons and similarly secure facilities,[59] that have upheld suspicionless searches of individuals and automobiles that were as intrusive as the searches conducted in the instant case. For example, our Court of Appeals in *United States v. Albarado,* 495 F.2d 799 (2d Cir.1974) (*"Albarado"*) recognized the necessity of subjecting every airline passenger to a weapons search. However, the court in that case did not authorize initial frisks of all airline passengers; instead, because "passing through a magnetometer has none of the indignities involved in ... a frisk," *id.* at 806, frisks were permitted only after an individual had first triggered a free-standing magnetometer, then been given an opportunity to remove any metal objects from his person, and then triggered the magnetometer a second time. *Id.* at 807–809. *See also McMorris v. Alioto,* 567 F.2d 897, 901 (9th Cir.1978) (permitting frisks of persons entering courthouse where evidence established that "[t]hey are apparently given more than one opportunity to pass through the magnetometer" before being subjected to a pat-down search).

In contrast, no free-standing magnetometers were used to search persons attending Klan rallies in Connecticut. Instead, most persons attending the rallies were required at a minimum to submit to initial pat-down frisks by law-enforcement officers. Even at the two rallies where some searches were conducted with hand-held magnetometers, which are arguably more intrusive than free-standing magnetometers, an individual who triggered the magnetometer was immediately frisked without having an opportunity to remove any metal objects from his pockets or elsewhere on his person and then to be searched again with the magnetometer. *See* Findings of Fact, *supra,* at note 31 and accompanying text.

Accordingly, the court finds that the privacy interests implicated by the indiscriminate searches of persons and automobiles at Klan rallies are substantial.[60] Further-

---

**59.** *See* Section 3, *infra,* for a discussion of the significance of the location of the search in the Fourth Amendment analysis.

**60.** It is true that our Court of Appeals has held that a frisk, while "normally ... considered a gross invasion of one's privacy," may become somewhat "less noxious" where, as here, all those present may be subject to search, the person has some advance notice that he may be searched if he chooses to engage in a particular activity, and he may avoid search by forgoing that activity. *Albarado, supra,* 495 F.2d at 807–808. However, as the court implicitly recog-

more, the intrusions on personal privacy were exacerbated by the manner in which some of the searches were conducted. For example, the record reveals that the plaintiffs and other Klan members were sometimes subjected to several searches of their persons and automobiles at a single rally for no apparent purpose, *see id.* at note 30 and accompanying text, and that some of the searches were significantly more intrusive than the frisks described in *Terry.* *See id.* at note 29 and accompanying text. It is not clear that any of the defendants approved or ratified these particular searches. However, these incidents illustrate the disregard of privacy interests that can result from an official policy that permits indiscriminate searches.

### 3. The places where the searches occurred

The Supreme Court explicitly recognized in *Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884, that the reasonableness of a search is dependent in part on "the place in which it is conducted." In that case, the Court permitted suspicionless searches of prison inmates after contact visits expressly because "[a] detention facility is a unique place fraught with serious security dangers" where persons could have few reasonable expectations of privacy. *Id.* The Court has not authorized suspicionless searches of individuals or automobiles in any other context. *See, e.g., United States v. Ortiz, supra* (vehicle searches at checkpoints near boarder may be conducted without consent only if there is probable cause to believe that the vehicle contains illegal aliens).

The public parks, streets and sidewalks where most of the Klan rallies occurred are a far cry from prison cell blocks, the only

location where the Supreme Court has permitted persons to be searched without suspicion. *See Bell v. Wolfish, supra.* The Court has repeatedly characterized parks, streets and sidewalks as traditional public forums that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). It is for this reason that "the government's ability to permissibly restrict expressive conduct [in such public forums] is very limited." *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983).

There is also a clear distinction between traditional public forums and those few locations in which the lower federal courts have permitted suspicionless searches of persons and their vehicles. For example, courts have upheld searches conducted in or near prisons and military installations, *see, e.g., United States v. Miles,* 480 F.2d 1217 (9th Cir.), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 369, 38 L.Ed.2d 245 (1973) (search of vehicle seeking to enter restricted area of military base); *McDonell v. Hunter,* 612 F.Supp. 1122 (S.D.Iowa 1985) (frisks of prison employees), where "security considerations reduce the scope of reasonable expectations of privacy that one normally holds and make[] reasonable some intrusions that would not be reasonable outside of the facility." *Id.* at 1128. *But see Blackburn v. Snow, supra,* 771 F.2d at 564 (rejecting the argument that the security needs of the jail justified a policy of suspicionless strip searches of all jail visitors).

---

nized in *Albarado,* the invasion of privacy remains substantial even under these mitigating circumstances. *Id.* at 807–810. Moreover, universal frisks are not necessarily less intrusive than selective ones where the persons frisked are not airline passengers, as in *Albarado,* but instead are persons seeking to attend rallies of an unpopular political organization. As the court recognized in *Albarado, supra,* 495 F.2d at 807, the "stigma" attaching to a frisk "is lessened by being one of a crowd" of airline passengers;

however, the stigma felt by some spectators at Klan rallies may not be substantially reduced as a result of receiving the same treatment as white-robed Klansmen. *Cf. N.A.A.C.P. v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958) (observing that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs").

The instant case is likewise distinguishable from those cases that have permitted suspicionless weapons searches of persons at airports and courthouses, *see, e.g., Albarado, supra* (airline passengers); *McMorris v. Alioto, supra* (courthouse visitors), because airplanes and courthouses, like prisons and military bases, present special security concerns that are not present in traditional public forums. The threat posed by a weapon on an airplane or in a courthouse is significantly different from the threat posed by a weapon at a public rally. That is because rallies can be monitored by law-enforcement officers who can be expected to deter violence by their mere presence and to take prompt and appropriate action to control any violence that does occur; in contrast, there usually are no law-enforcement officials present on an airplane or in most areas of a courthouse who could deter or control any incidents of violence. *See generally Gaioni v. Folmar,* 460 F.Supp. 10, 13 (M.D.Ala.1978) (Johnson, J.) (rejecting analogy between suspicionless airport searches and suspicionless searches of persons attending rock concert on the ground that "airport searches ... are justifiable only because of certain 'unique circumstances,' such as the enormous potential for violence in an airplane bombing or hijacking and the necessity of discovering the plot before overt action is taken"). Furthermore, because a courthouse where criminal cases are tried presents some of the same security concerns as does a prison, a person's reasonable expectations of privacy are less substantial in a courthouse than in a traditional public forum.

Of course, the instant case is also distinguishable from those cases that have permitted suspicionless stops of persons and vehicles entering the United States at checkpoints located near the border. *See, e.g., United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (*"Martinez-Fuerte"*).[61] The courts have long recognized that

> [b]order searches are, and have always been, sui generis. Neither warrant nor probable cause is essential for such a search, which is presumed reasonable merely by virtue of the person's or thing's entry into our country from the outside.

*United States v. Saunders,* 663 F.2d 1, 2–3 (2d Cir.1981), *citing United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977).

Accordingly, the court holds that the fact that most of the searches occurred at traditional public forums that were being used for expressive activity—rather than in prison, airports or other locations with special security needs that could not be met through standard law-enforcement techniques—weighs against the constitutional validity of the searches.

### 4. *The Fourth Amendment balancing test*

The court must now proceed to "balanc[e] ... the need for the particular search against the invasion of personal rights that the search entails" as required by *Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884. First, the court has found that the need for the indiscriminate searches of persons and vehicles is relatively insubstantial, because the important purpose of preserving order at Klan rallies is already being adequately served by other, less intrusive measures; these include the deployment of a sufficient number of law-enforcement officers, the use of standard crowd-control techniques, and the adoption of reasonable time, place and manner restrictions with respect to the rallies. *See* Section 1, *supra.* Second, the court has found that the personal privacy interests implicated by the searches of individuals

---

**61.** Furthermore, the activity authorized in *Martinez-Fuerte* consisted only of stopping vehicles at a checkpoint some distance from the border and questioning their occupants; the Court's decision was expressly limited to stops where "[n]either the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search." 428 U.S. at 558, 96 S.Ct. at 3083. *Cf. United States v. Ortiz, supra* (vehicle searches at checkpoints near border may be conducted without consent only if there is probable cause to believe that the vehicle contains illegal aliens).

and their vehicles are significant. *See* Section 2, *supra.* Finally, the court has found that the fact that the searches were conducted in traditional public forums weighs against their constitutional validity. *See* Section 3, *supra.*

The court must conclude upon weighing these factors that the searches at issue in the instant case are unreasonable under the Fourth Amendment. This conclusion is reinforced by the defendants' failure to call to the court's attention any decisions of the Supreme Court or our Court of Appeals that have permitted public officials to conduct suspicionless searches so intrusive on personal privacy outside prisons and other facilities with special security needs that cannot be met through the use of standard law-enforcement practices.

The defendants have attempted to avoid this result by referring to decisions that have authorized so-called "administrative" searches conducted without individualized suspicion for some purpose other than enforcing the criminal laws. *See, e.g., Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (searches of workplaces by Occupational Health and Safety Administration); *Martinez-Fuerte, supra* (stops of vehicles passing permanent customs checkpoints); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (searches of residences conducted for purpose of enforcing municipal housing code). However, as explained in greater detail above, the courts have authorized no suspicionless "administrative" search that was as intrusive as the searches conducted in the instant case and that was conducted outside a prison, military base, airport, border checkpoint or similar location with unique security needs.

Furthermore, the Supreme Court and our Court of Appeals, in determining whether searches of individuals and their possessions are reasonable under the Fourth Amendment, have been reluctant to distinguish so-called "administrative" searches from searches conducted in the investigation or prosecution of a crime. For example, the Supreme Court only recently observed that

> [b]ecause the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," ... it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."

*New Jersey v. T.L.O., supra,* 105 S.Ct. at 740 (citations omitted). *See also Delaware v. Prouse, supra,* 440 U.S. at 662, 99 S.Ct. at 1400 (1979) ("if the government intrudes ... the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards"); *Martinez-Fuerte, supra,* 428 U.S. at 560 n. 14, 96 S.Ct. at 3084 n. 14 ("[t]he fact that the purpose of such laws [allowing state and local officials to stop automobiles to check drivers' license, safety requirements and similar matters] is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel"); *Albarado, supra,* 495 F.2d at 804 n. 9 (observing that there is "no analytical significance" to the label "administrative" when applied to an airport search). Indeed, the Court of Appeals has observed that "there seems no rational limit to what searches can be ultimately justified on the basis of [the administrative search cases] once the reasoning of those cases is expanded beyond facts which involved detection of local building code violations." *United States v. Barbera,* 514 F.2d 294, 299 n. 12 (2d Cir.1975).

Instead, the foregoing decisions suggest that the courts intend to limit suspicionless "administrative" searches to circumstances similar to those of *Camara v. Municipal Court, supra,* 387 U.S. at 537, 87 S.Ct. at 1735, where the search is of a type that has "a long history of judicial and public acceptance," where "it is doubtful that any other canvassing technique would achieve acceptable results," and where "the inspec-

tions are neither personal in nature nor aimed at the discovery of evidence of crime."

Accordingly, the court must reject the defendants' contention that the suspicionless frisks of the plaintiffs and searches of their automobiles should be upheld as permissible "administrative" searches.

Similarly unavailing is the defendant's argument that the searches at issue in this case are somehow made reasonable by the fact that court orders were obtained prior to thirteen of the fourteen rallies at which searches were conducted. Even if one assumes for the argument that the existence of a court order authorizing suspicionless searches would have some bearing on the reasonableness of such searches, the court orders in this case provided no authority for any such searches. Instead, the court orders merely authorized law-enforcement officials *"where appropriate* to perform frisks." *See* Findings of Fact, *supra,* at note 20 and accompanying text (emphasis added). Only one of the court orders provided any authority for automobile searches. *Id.* Furthermore, the legitimacy of suspicionless searches was never ruled upon by any of the state courts that issued the orders.

In sum, the court concludes, for the reasons stated above, that the defendants' practice of searching persons and vehicles attending Klan rallies without individualized suspicion of dangerousness or wrongdoing violates the plaintiffs' rights under the Fourth Amendment.[62] Accordingly, the defendants shall be permanently enjoined from conducting such searches in the absence of "specific and articulable" facts to support a reasonable belief that a particular individual poses a threat to the public safety, *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879, or probable cause to believe that the individual is violating the law.

B. The Due Process Challenge

■ The plaintiffs also contend that they were deprived of their rights to due process of law under the Fourteenth Amendment by certain actions taken by the defendants in obtaining court orders prior to thirteen of the Klan rallies. More specifically, the plaintiffs contend that the defendants denied them "meaningful appellate review" of the court orders by seeking the orders only shortly before the rally dates and by failing to assure that each order was accompanied by an explanation of the state court's reasoning process.

The plaintiffs can prevail on a due process claim only if they were deprived under the challenged procedure of a protected "liberty" or "property" interest. *See generally Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). However, as noted above, the court orders do not deprive the plaintiffs of any rights secured to them under federal or state law. Instead, the court orders merely state that the law-enforcement officials may perform searches "where appropriate"—or, in other words, where such searches would be consistent with the relevant Fourth Amendment precedents of the Supreme Court. It would be inappropriate for this court to presume from the record of this case that the state courts intended by the quoted language to authorize any actions contrary to the United States Constitution.

Accordingly, the court must reject the plaintiffs' claims under the Due Process Clause.

C. The "Qualified Immunity" Defense

■ The plaintiffs seek nominal damages for the violation of their constitutional rights against the defendants Forst, Long and the City of Meriden. The defendants must be held immune from liability for damages if the court finds that their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). However, "[i]f the law was clearly established, the immunity defense ordinarily

---

**62.** It is therefore unnecessary for the court to consider the plaintiffs' alternative argument that the challenged searches violate their rights under the First Amendment.

should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818, 102 S.Ct. at 2738.

It is irrelevant to the immunity inquiry after *Harlow v. Fitzgerald* whether a defendant acted with a subjective good-faith belief that his conduct was constitutional. The court has no reason to believe that the defendants in this case were motivated by any evil purpose; instead, they apparently conducted the searches at issue in good faith and for the sole purpose of maintaining order under difficult circumstances.

However, the conditions under which police officers may conduct frisks of individuals and searches of automobiles have been clearly established by the Supreme Court in a series of decisions that antedate the events at issue here. *See* Part A, *supra.* As noted above, the defendants have been unable to point to any decisions of the Supreme Court or of the lower federal courts that have authorized indiscriminate searches so intrusive of personal privacy interests to be conducted in settings other than prisons, military bases, airports and other areas with special security concerns that cannot be adequately addressed through standard law-enforcement techniques.

The defendants, as reasonably competent law-enforcement authorities, should have known of the law applicable to searches conducted without individualized suspicion. Accordingly, the defendants are jointly liable to each of the plaintiffs for $1 in nominal damages. *Cf. Dale v. Bartels*, 732 F.2d 278, 285 n. 12 (2d Cir.1984) (Friendly, J.) (holding that claim was not precluded on qualified immunity grounds where "[t]he unlawful seizures alleged by [the plaintiff] constitute clear violations of well-known fourth amendment rights of which a law enforcement officer such as [the defendant] had every reason to be aware").

### IV. Conclusion

The court has "approach[ed] the issues in this case mindful of the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other," *Terry, supra,* 392 U.S. at 12, 88 S.Ct. at 1875, but conscious of its time-honored "responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires." *Id.* at 5, 88 S.Ct. at 1871. "When such conduct is identified," the Supreme Court has instructed, "it must be condemned by the judiciary." *Id.*

The record of this case indicates that Connecticut law-enforcement officers have the knowledge and the experience to maintain order at Klan rallies through the use of crowd-control techniques that are less intrusive than the mass searches challenged in this lawsuit. It was the police's eventual mastery of these techniques, and not their indiscriminate searches of persons and automobiles, that prevented violence at each of the thirteen Klan rallies conducted since Meriden II on July 11, 1981. Indeed, today's decision may be viewed as an expression of confidence in the ability of Connecticut law-enforcement officers to preserve the peace under concededly difficult circumstances without resorting to a practice that "trenches upon personal security without the objective evidentiary justification which the Constitution requires." *Id.*

Of course, this decision does not necessarily prevent the police from adopting new techniques that are intended to maintain order at potentially explosive political events without infringing the constitutional rights of participants and spectators; moreover, the defendants are not barred from seeking relief from the prospective effect of this decision if future Klan rallies depart so substantially from past rallies as to suggest that order can no longer be maintained without the use of more intrusive measures. *See* Rule 60(b)(5), Fed.R. Civ.P. (court may modify judgment if "it is no longer equitable that the judgment should have prospective application"). The court intimates no view with respect to the application of today's decision to other law-enforcement tactics or to political events

that are less amenable to control through accepted law-enforcement techniques than the Klan rallies at issue in the instant case.

Finally, the court cannot promise that not even a black eye or a bloody nose will ever occur at any future Klan rally held in Connecticut. Our system of ordered liberty cannot guarantee that the clash of views will never erupt into the clash of fists. It cannot guarantee that a person will never suffer physical or emotional harm as a result of another person's exercise of his constitutionally protected freedoms.

However, the choice of whether to impose restrictions *before* any unrest has occurred, or to take action only *after* the unrest has erupted, cannot always be left to the discretion of law-enforcement officials, regardless of their competence and their good faith. In some cases, as where the preventive measures would infringe an individual's rights of privacy or expression, we must occasionally accept the risk of violence in order to preserve the fundamental liberties enshrined in our Constitution. As the Supreme Court has recognized,

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken ... that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk ...; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious society.

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).

In sum, the court has found that the plaintiffs' rights under the Fourth Amendment have been infringed by the practice of indiscriminately searching persons and automobiles at Klan rallies in Connecticut. The defendants are hereby enjoined from conducting such searches at future Klan events in the absence of either (1) "specific and articulable" facts to support a reasonable belief that a particular individual poses a threat to public safety, *Terry, supra*, 392 U.S. at 21, 88 S.Ct. at 1879, or (2) probable cause to believe that the individual is violating the law (including a valid ban on the possession or display of weapons at rallies). In addition, the defendants Long, Forst and the City of Meriden are jointly liable to each of the plaintiffs for $1 in nominal damages on account of the infringement of their constitutional rights.

It is so ordered.