**Bill WILKINSON and James Farrands, Plaintiffs-Appellees,**

v.

**Lester FORST, Donald Long, Austin McGuigan and the City of Meriden, Defendants-Appellants.**

**No. 352 Docket 86–7631.**

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1986.

Decided Nov. 9, 1987.

Shelly White, Hartford, Conn., Matthew Horowitz, Springfield, Mass. (Martha Stone, Connecticut Civil Liberties Union Foundation, Hartford, Conn., of counsel), for plaintiffs-appellees.

Carl Schuman, Senior Appellate Attorney, Assistant State's Attorney, Office of the Chief State's Attorney, Division of Criminal Justice, Wallingford, Conn. (Joseph I. Lieberman, Atty. Gen., State of Conn., Stephen J. O'Neill, Asst. Atty. Gen., Richard T. Biggar, Asst. Atty. Gen., John J. Kelly, Chief State's Atty., Scott J. Murphy, Asst. State's Atty., James J. Szerejko, Halloran, Sage, Phelon & Haggerty, Hartford, Conn., of counsel), for defendants-appellants Lester J. Forst, Commissioner of Public Safety, and Donald Long, former Commissioner of Public Safety, of the State of Connecticut.

John M. Massameno, Asst. State's Atty., Senior Appellate Attorney, State of Conn., Wallingford, Conn., (Thomas H. Hrusa, Roseanne Wagner, Mitchell Goldklang, Law Student Interns, of counsel), for defendant-appellant Austin J. McGuigan, former Chief State's Attorney of the State of Connecticut.

Corporation Counsel, City of Meriden, for defendant-appellant City of Meriden.

Before KAUFMAN, WINTER and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendants appeal from a judgment of the United States District Court for the District of Connecticut (José A. Cabranes, *Judge*) enjoining them from indiscriminately searching persons and automobiles at rallies held in the State of Connecticut by the Invisible Empire of the Knights of the

Ku Klux Klan ("Klan") in the absence of either (1) "specific and articulable" facts to support a reasonable belief that a particular individual poses a threat to public safety, *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), or (2) probable cause to believe that the individual is violating the law (including a valid ban on the possession or display of weapons at rallies), and further adjudging the defendants Long, Forst, and the City of Meriden jointly liable to each of the plaintiffs for one dollar in nominal damages on account of infringement of their constitutional rights.

The opinion below is reported at 639 F.Supp. 518 (D.Conn.1986). In an earlier opinion, *Wilkinson v. Forst*, 591 F.Supp. 403 (D.Conn.1984), Judge Cabranes denied defendant McGuigan's motion for summary judgment and his motion to dismiss on grounds of standing, mootness, and ripeness. An opinion denying post-trial motions for a stay of proceedings pending appeal or for relief from judgment is reported at 656 F.Supp. 710 (D.Conn.1986). Familiarity with the opinions below is assumed.

Plaintiffs are current or former Klan officers, and defendants are current and former Commissioners of Public Safety of the State of Connecticut, the former Chief State's Attorney,[1] and the City of Meriden, Connecticut.

We affirm the injunction entered below as to its prohibition of pat-down and automobile searches without reasonable suspicion or probable cause, but reverse and remand with a direction to modify the injunction to allow general magnetometer searches at future Klan rallies in Connecticut without regard to standards of reasonable suspicion or probable cause; reverse the award of nominal damages against Lester Forst and Donald Long; and reverse and remand with respect to the award of nominal damages against the City of Meriden.

*Background* [2]

This lawsuit results from sixteen rallies conducted by the Klan in Connecticut from September 13, 1980 through April 29, 1984,[3] and searches conducted by Connecticut authorities in connection therewith. The district court found that the Klan intends to conduct future rallies in Connecticut, plaintiffs plan to participate in those rallies, and defendants can be expected to seek court orders similar to those obtained prior to previous rallies and to search all persons attending future rallies, *see* 639 F.Supp. at 524, unless precluded from doing so as a result of this litigation.

In the summer of 1980, officials of the Connecticut State Police ("CSP") learned that the Klan was planning to hold a rally on September 13, 1980 in the small rural community of Scotland. This was to be the first Klan-affiliated rally in Connecticut in about half a century, and was scheduled to take place approximately one year after several people were killed in a clash between a Klan faction and opposing groups in Greensboro, North Carolina.[4] News of the Klan rally prompted various individuals and groups, including the International Committee Against Racism ("INCAR"), to plan counter-demonstrations in Scotland. Some of these groups had a prediliction for hostile confrontation with the Klan and the police.[5] Moreover, Klan members ex-

---

1. The present and former Commissioners of Public Safety, defendants Forst and Long, are sued in their individual and official capacities. Defendant McGuigan, the former Chief State's Attorney, is sued only in his official capacity. Second Amended Complaint ¶¶ 6–8.

2. Many of the facts recited hereinafter were stipulated between the parties.

3. Two other rallies were conducted prior to trial, and at least one thereafter, but the parties stipulated to present no evidence concerning these later rallies except, as to the two rallies which preceded the trial, with respect to plaintiffs' standing. *See* 639 F.Supp. at 520 n. 6.

4. It is undisputed that plaintiffs belong to one of several Klan factions that exist throughout the nation, and that the Connecticut Klan is not the same organization that was involved in the Greensboro incident.

5. For example, CSP Major Joseph A. Perry, Jr., who is black, testified as follows concerning a conversation with an INCAR representative on September 12, 1980, the day before the initial Scotland rally:

Q. Can you tell us what was said in that conversation?

A. I related to them at the time that I had met with Mr. Wilkinson that previous day.

pressed an intention to arm themselves for purposes of self-defense, and plaintiff Wilkinson's armed bodyguards were scheduled to attend the rally. Reliable information from an undercover agent of the United States Treasury Department indicated that INCAR members would be armed (though not with firearms) and ready to attack Klansmen. Several neighborhood residents heard gunfire emanating from the private property on which the Klan rally was to be held in the days preceding the scheduled rally.

Against this background, state and local authorities sought (*ex parte*) and obtained a state court injunction banning the "carrying on one's person or in a motor vehicle [of] a firearm or other dangerous weapon" within the boundaries of the Town of Scotland on the days of the rally, absent specific authorization from Scotland authorities.[6] The injunction was enforced by establishing various checkpoints on main roads leading into Scotland, within the town, and just outside the rally site. At the checkpoints, motorists and pedestrians were informed that they were "subject to search"[7] if they proceeded to the vicinity of the rally. The decision whether or not to search was within the discretion of individual officers, and the officers did not feel constrained by standards of probable cause or reasonable suspicion. Motorists and pedestrians were told that they would not be subject to search if they avoided the area of the rally. The searches produced seven firearms, fifty-four rounds of ammunition, forty-one knives, two swords, two machetes, five baseball bats, three pieces of pipe, eight lengths of chain, two cans of mace, three sling shots, one set of weighted knuckles, a detonator, and a number of clubs.

Although the rally itself occurred without incident, members of Citizens Against Racism, during an attempt to march to the rally, attacked people in the area outside the rally site with fists, rocks, sticks, and flagpoles, resulting in injuries to a number of persons.

The next demonstration relevant to this lawsuit took place on March 21, 1981 in Meriden ("Meriden I"). It was a planned march to and from City Hall. The State did not attempt to search all persons and vehicles at checkpoints on a less than probable cause basis, and no court order was sought or obtained. The demonstration was attended by fifty police officers, twenty-one Klansmen, 1,500 to 2,000 spectators and press, and a substantial number of anti-Klan demonstrators. As Klan members arrived at the City Hall steps, they were attacked with rocks and bottles thrown by anti-Klan forces. A person with a bullhorn advocated violence against the Klan and the police. Fist fights broke out among various groups in the crowd, and automobile windows were smashed. As the police attempted to escort the Klan out of the area, demonstrators pelted the Klan and the police with rocks, bottles, boards, clubs, and bricks. Two people used a building block to strike plaintiff Farrands' daughter on the back. At some point during the demonstration, Klansman Clyde Dick was restrained by the police when he attempted to draw a revolver from his coat pocket. Twenty policemen, six Klansmen, and one bystander received injuries. Many of the officers were hit with rocks or bricks. One female Klan member suffered head lacerations and injuries to the skull, while another was rendered semiconscious by a blow to the head.

Q. And what did Mr. Swartz [the INCAR representative] say to you?
A. That he was amazed that I was a black armed with a gun and did not shoot Mr. Wilkinson; that I was almost duty bound to do this type of thing.
Tr. p. 854.

**6.** Under Connecticut law, persons may carry handguns or knives if they have a permit. A permit is not needed to carry a shotgun or rifle, but loaded shotguns and rifles may not be car-

ried in motor vehicles. *See* Conn.Gen.Stat. §§ 29–35, 53–205, and 53–206 (1985). We are not presented with any contention that this state court injunction, or similar successor injunctions involved in this case, impermissibly narrowed the right to bear arms afforded by pertinent Connecticut statutory law.

**7.** Unlike the later state court orders in this case, the Scotland order included no express authorization of searches.

The next demonstration ("Meriden II") took place in Meriden on July 11, 1981. It was to be held in a public square. Once again, the State sought no court order banning weapons or authorizing searches. One hundred and three police officers, twenty-five Klansmen, a substantial number of anti-Klan forces, and about seven hundred spectators and press were in attendance. The Klansmen were subjected to pat-down searches, to which they allegedly consented, prior to the rally. The searches uncovered two pistols with valid state permits and several axhandles, sticks and pocketknives, all of which were confiscated by the police. The police disarmed a group of anti-Klan demonstrators whom they observed gathering and carrying rocks, sticks and clubs.

This rally ended before it began. As soon as the Klan, escorted by police, appeared on the square, INCAR members commenced throwing rocks, bottles, and tin cans in their direction. Several fist fights broke out within the crowd. Police halted the rally promptly and ordered the area cleared. Three officers and one Klansman were treated for injuries.

After the Meriden II rally, state officials decided upon a new course of action to prevent outbreaks of violence. For the Windham rally of October 10–11, 1981, and for the subsequent twelve rallies involved in this lawsuit, the relevant authorities sought state court injunctions banning the carrying of firearms or other dangerous weapons on and around the rally sites and permitting searches of persons attending the rallies. The order banning weapons typically extended only to the rally site and the immediate vicinity. The language authorizing searches generally followed that used in the Windham order, which provided:

> All persons entering the designated area will be advised of the injunction and the option of leaving the area with their weapons. *Those who choose to enter the designated area will be questioned concerning their possession of weapons*

*and, where appropriate, a frisk for weapons will be performed.* All lawfully possessed weapons held pursuant to the injunction will be tagged and returned to the lawful owners upon their exit from the designated area.[8]

Emphasis added. All of the State's applications for injunctive relief were granted, with the sole exception of the application for an injunction at the Canterbury rally held on August 14, 1982.

The court orders typically prohibited the carrying of firearms or other dangerous weapons on one's person or in a vehicle within the designated area, although only the order pertaining to the rally held at Groton on April 29, 1984 specifically authorized vehicle searches. When the subject came up at the court hearings where injunctions were sought, it was made clear that the applicants were seeking authority, and intended, to search any automobiles which entered the area to which the injunction applied.

As to personal searches, the opinion below concludes that nothing in these orders authorized the police to conduct searches or frisks on a less than probable cause or reasonable suspicion standard. *See* 639 F.Supp. at 530. Whatever the merits of this conclusion as a matter of textual construction, the record demonstrates that at the state court hearings at which injunctions were sought, the public authorities again made it clear that they were seeking the authority, and indeed were intending, to search all persons who proceeded into the areas to which the injunctions applied.

The reader is referred to the district court's opinion for an exhaustive treatment of the various rallies and searches. Suffice it to say, for present purposes, that no major disruptions marked the Klan rallies after the state began its search policy. (We note that no major disruption occurred at the Canterbury rally either, where a court order was not in effect and personal searches were not authorized or conducted.) Defendants concede that their handling of the rallies improved over time, and

---

**8.** Several of the later orders enjoined the possession of "firearm[s] or other dangerous weapons or instruments" (emphasis added) at the rallies. *See* 639 F.Supp. at 521 n. 18.

that increased police presence, the separation of contending factions, the choosing of more appropriate sites, and pre-rally sweeps of the demonstration sites helped improve security at the later rallies. There were very minor incidents away from the rally sites at two of the remaining rallies.

The district court found, and it is clear from the record, that "all or virtually all persons were stopped and searched" by officers before entering the rally sites. *See* 639 F.Supp. at 521–22. The CSP was involved, to varying degrees, with local police forces in maintaining order at the rallies. It is conceded that attendees were given the choice of submitting to the pat-down searches or leaving. Hand held magnetometers were used, in conjunction with pat downs, at the Norwich and West Haven rallies, but the record is unclear as to which police force owned or leased the machines and why they were only used at two of the rallies. Those persons setting off the magnetometers were immediately patted down, and were not given the option of leaving the rally site.

It is uncontested that some of the automobile searches were exceedingly thorough, and that certain Klansmen were searched both entering and leaving the rally site at Danbury, despite pre-rally clearance of the site by authorities. Further, plaintiffs Wilkinson and Farrands were rather thoroughly searched, apparently to the point of harrassment, on several occasions. At some rallies, some persons were subjected to full clothing searches that went beyond the classic pat-down frisk. The defendants do not attempt to justify these searches, but maintain, correctly we think on this record, that the overwhelming majority of the searches were ordinary frisks.

The kinds of weapons or potential weapons confiscated by the police at the rallies are indicated by some of the items seized at Danbury: three clubs, fifteen shells, twenty-seven knives, seven axes, a pick, two pitchforks, eleven ax or hammer handles, twenty-three arrows, two hatchets, five sheaths, four tomahawks, six machetes, two shillelaghs, four rubber hose pieces, three tear gas containers, two pellet guns, a BB gun, two spears, a lead pipe, a chain with lead weights, an Indian head club, a metal pike, a blackjack, a crossbow, a whip, a flare-launcher, and a wooden stake. In fairness, it should be added that some of these items were taken from the property on which the rally was to be held.[9] But similar items were confiscated at other rally sites, such as Windham, where police confiscated mace, claw hammers, tire irons, baseball bats, scissors, razors, screwdrivers, bottles, an ice pick, a steel bar, and the like.[10]

The record is clear that the Klan was generally cooperative with state and local police forces, and did not explicitly incite any violence. Nevertheless, the Klan, in the course of publicizing its rallies, made known its intention to arm its members for purposes of self-defense. Moreover, the Klan, due to its history and methods of publicizing rallies, tends to incite other actors in the political community.

Shortly after the State implemented its search policy, plaintiffs brought this action pursuant to 42 U.S.C. § 1983 (1982), alleging that the State policy of conducting searches without individuated probable cause or reasonable suspicion violated their rights under the first, fourth, and fourteenth amendments to the United States Constitution. Plaintiffs do not challenge the propriety of the orders banning the carrying of weapons, or the police policy of separating contending forces at the rallies.

---

**9.** We have not included in the above tabulation a machine gun and approximately thirty rifles which were seized from the owner of the property. The district court opinion stated that firearms were confiscated at only two of the rallies, including Danbury, *see* 639 F.Supp. at 522 & n. 35, but this tabulation does not take into account the confiscation of firearms at Scotland and Meriden II described *supra* at 1333–34.

**10.** The exhibits at trial do not itemize everything that was seized at every rally, but there seemed to be a decline in the quantity of items seized at the later rallies. *Compare United States v. Albarado,* 495 F.2d 799, 804 (2d Cir.1974) (decline in airplane hijackings resulting from airport search policies).

The defendants countered that the frisks

The defendants countered that the frisks were reasonable under the circumstances, similar in nature to searches performed in courthouses and airports. According to defendants, the searches serve the vital state function of protecting life and property, and in fact foster first amendment freedoms by allowing the Klan rallies to proceed in peace.

At trial, plaintiffs relied heavily upon the expert testimony of Robert W. Klotz, a retired Deputy Chief of Police in the District of Columbia with extensive experience in crowd control techniques. Chief Klotz testified that in his opinion, order had been maintained at the Connecticut Klan rallies after Meriden II due to procedures such as increased police presence, crowd separation, pre-rally clearance of sites, and improved choices of rally locations. Chief Klotz did not think that the policy of mass pat-down searches contributed significantly to the restoration of order at Klan rallies. On cross examination, however, Chief Klotz conceded that the method employed to handle the rallies was not necessarily incorrect, that it was reasonable to infer that the court orders permitting searches contributed to the success of the later rallies, and that it was reasonable to infer that people brought fewer weapons to rally sites after Meriden II because they knew that they would be searched. In this connection, he specifically testified:

Q  Would you agree that at least some people would be deterred from carrying weapons because they knew they were going to be searched?

A  Yes, I would agree with you.

Q  In fact, the only demonstration after Meriden II in which there was not a court order was the Canterbury rally; isn't that correct?

A  Yes, sir.

Q  And in that there were some 30 shotguns, rifles seen in the hands of Klansmen?

A  I believe that's correct.

Q  So, doesn't that suggest that the reason that the guns weren't seen at the later rallies is because there was this court order and the searches being conducted?

A  I think it naturally follows, yes, sir. Tr. pp. 581–82.

Defendants relied primarily on the testimony of several officers in the CSP to the effect that the court orders and searches greatly facilitated the maintenance of order at Klan rallies. These witnesses also testified that it was often difficult completely to separate antagonistic forces at the rallies, because it was hard to determine who was a spectator and who was an anti-Klan activist.

### The Decision Below

In its fourth amendment analysis, the court below saw its duty as " 'balancing ... the need for the particular search against the invasion of personal rights that the search entails[,]' " taking into account " 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " *Wilkinson*, 639 F.Supp. at 524–25, (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)). The court first examined the need for the searches. While acknowledging that the maintenance of order at public events is an important state function, the court saw little need for the searches at issue here, because the purpose of the searches could be achieved by less intrusive means such as "deployment of an adequate number of law-enforcement officers, the mastery of traditional crowd-control techniques, ... and the use of reasonable time, place and manner restrictions that may require, for example, that rallies be held at sites where security can be more easily assured and that Klan forces be separated from anti-Klan forces at the rallies." 639 F.Supp. at 525. In reaching this conclusion, the court credited completely the testimony of Chief Klotz.

The court next considered the scope of the intrusions at issue and the manner in which they were conducted, and found the pat-downs and baggage and automobile searches to be substantial invasions of privacy. Judge Cabranes recognized that the

personal searches which went beyond the court authorized pat-downs were probably not ratified or approved by the defendants, but noted that "these incidents illustrate the disregard of privacy interests that can result from an official policy that permits indiscriminate searches." *Id.* at 527.

The court then considered the places where the searches occurred, and concluded "that the fact that most of the searches occurred at traditional public forums that were being used for expressive activity weighs against the constitutional validity of the searches." *Id.* at 528. The court rejected the state's attempt to analogize searches at Klan rallies to those at airports and courthouses or to border searches. As to airport and courthouse searches, the court noted the typical absence of law enforcement officers on airplanes or in courtrooms, the special dangers posed by an airplane bombing or hijacking, and the unique security concerns relating to courtrooms where criminal cases are tried. As to border searches, the court observed that such searches have always been considered *sui generis. See id.* at 528.

Considering all these factors, Judge Cabranes found the searches at issue incapable of passing constitutional muster under the fourth amendment. He therefore found it unnecessary to consider plaintiff's first amendment claims. The district court did consider, however, and reject, plaintiff's due process claim under the fourteenth amendment, which rested primarily upon a purported denial of "meaningful appellate review" because the state court orders were sought shortly before the rally dates. The district court found that the state court orders themselves did not deprive plaintiffs of any constitutional rights because, as noted earlier, Judge Cabranes concluded that the orders did not authorize the searches which in fact occurred. Finally, the court rejected the defendants' claims of qualified immunity, holding that their conduct violated clearly established fourth amendment principles, and therefore awarded nominal damages against defendants Forst, Long and the City of Meriden.

*Discussion*

It is ironic, as noted by Judge Cabranes in his first *Wilkinson* opinion, 591 F.Supp. at 405 n. 2, that plaintiffs are proceeding under 42 U.S.C. § 1983 (1982), the original first section of the Ku Klux Klan Act of April 20, 1871. The Act was passed in an effort to protect freedmen and loyal whites from deprivation of their Constitutional "rights, privileges, or immunities" at the hands of the Ku Klux Klan and cognate groups. The Connecticut Klan now contends that defendants are abridging their first, fourth, and fourteenth amendment liberties, thereby violating that statute, through the implementation of mass pat-down searches. Yet another irony is found in the defendants' argument that they are in fact protecting the first and fourteenth amendment rights of the citizenry by allowing the Klan rallies to proceed in peace.

It is well settled first amendment law that free speech rights cannot be denied because of the unpopularity of the views expressed. *Edwards v. South Carolina,* 372 U.S. 229, 237, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963). Thus, a public authority is usually not in a position to ban a Klan rally on the theory that it will arouse community opposition. In fact, municipal efforts to ban Nazi and Klan rallies have regularly met with judicial disapproval. *See e.g., Collin v. Smith,* 447 F.Supp. 676 (N.D.Ill.), *aff'd,* 578 F.2d 1197 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

States and municipalities are thus compelled to spend significant sums of money to preserve order and prevent violence at these rallies. With respect to the Klan, moreover, the organization sponsoring the rally has a history of violence and of provoking violence in its opponents. In the instant case, Connecticut authorities had specific information that the rallies at issue could potentially erupt into violence.

Defendants are not contending that they have the right to conduct blanket searches at all political rallies or at all political rallies where violence is anticipated, or at all Klan rallies or functions. Rather, they maintain that when an organization with a

historically demonstrable penchant for violence plans a rally which is to be attended by opposition groups who have historically clashed with the sponsoring organization, *and* public authorities obtain information that both sets of groups anticipate violence, those authorities, who have a duty to provide protection and maintain order at such rallies, may conduct pat-down searches of all those attending the rally.

However understandable the difficulties which Connecticut public authorities confront in dealing with Klan rallies, their conduct must nonetheless be measured against the constitutional standards of the fourth amendment, which prohibits "unreasonable searches and seizures." We agree with the district court that the test of the "reasonableness" of a search under the fourth amendment is well stated in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails[,]" and calls for consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. at 1884.

We confess some disagreement with the initial prong of the analysis undertaken by the district court in applying the *Bell v. Wolfish* criteria to the facts of this case. Addressing the need or justification for the searches under review in this litigation, the district court concluded, "based on the expert testimony of Chief Klotz and the other evidence presented at trial, that mass searches of persons and automobiles are not necessary or even particularly helpful in preventing violence at Klan rallies in Connecticut." 639 F.Supp. at 525. The district court found that the deployment of an adequate number of law enforcement officers, mastery of traditional crowd control techniques (including searches based upon individualized suspicion), and reasonable time, place and manner restrictions, including site selection and separation of opposing forces at rallies, have sufficed

and will suffice to maintain order at Klan rallies. *Id.*

We recognize that this conclusion was expressed as, and in fact constitutes, a finding of fact; that we are required by Fed.R.Civ.P. 52(a) to defer thereto "unless clearly erroneous," *see Anderson v. City of Bessemer City,* 470 U.S. 564, 572–77, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985); and that this deference must extend to ultimate, as well as subsidiary, findings. *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Lyddan v. United States,* 721 F.2d 873, 875 (2d Cir.1983), *cert. denied,* 467 U.S. 1214, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *Snyder v. Four Winds Sailboat Centre, Ltd.,* 701 F.2d 251, 253 (2d Cir. 1983). We further recognize the district court's reliance upon Chief Klotz's expert testimony on this subject, and the special deference mandated by Rule 52(a) with respect to a trial judge's credibility determinations. *See Anderson,* 470 U.S. at 574–77, 105 S.Ct. at 1512–13.

In this case, however, Chief Klotz made a clear concession on cross examination, quoted *supra* at 5961–62, that (1) at the only rally where a court order was denied and no searches were conducted, Klansmen attended with about thirty shotguns and rifles, and (2) it "naturally follow[ed]" that "the reason that the guns weren't seen at the later rallies is because there was this court order and the searches were being conducted." It accordingly follows that, whatever the efficacy of the other techniques emphasized by the district court and Chief Klotz in generally preserving order and preventing physical confrontations at the later Klan rallies, the court orders and searches played an important role in inhibiting the Klan members from bringing firearms to those rallies. On this record, especially in light of the Klan's stated intentions to bring firearms to their public rallies and use them in self defense if necessary, such inhibition is a legitimate and important objective.[11] In its findings, conclusions and evaluations concerning this question, we accordingly conclude that the

---

11. As the district court noted, 639 F.Supp. at 522 n. 21, searches of attendees at Klan rallies

would not preclude the use of firearms to fire into the rally by hostile elements who remained

district court gave inadequate weight to the need or justification for the searches at issue here.

This, of course, does not resolve the issue presented to us, especially since we are in accord with the district court concerning the intrusiveness of these searches. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 16–17 & n. 13, 88 S.Ct. 1868, 1877 & n. 13, 20 L.Ed.2d 889 (1968). On the other hand, we do not conclude nearly as forcefully as did the court below that the places where these searches occurred militate strongly against the searches conducted. Some of the sites in question, public streets and so forth, are indeed traditional public forums within the meaning of relevant first amendment jurisprudence. The district court weighed this factor heavily in denying the relevance of cases that have allowed indiscriminate searches at such locations as prisons, military installations, airports and courthouses.

It is true that the constitutional right to free speech is implicated here; but the constitutional right to interstate travel is also implicated in airport searches, as is the constitutional right to attend public trials in courtroom searches. The key factor in the cases allowing such searches was the perceived danger of violence, based upon the recent history at such locations, if firearms were brought into them. *See e.g., United States v. Edwards,* 498 F.2d 496, 500 (2d Cir.1974) (airport search); *United States v. Albarado,* 495 F.2d 799, 806 (2d Cir.1974) (airport search); *McMorris v. Alioto,* 567 F.2d 897, 899–900 (9th Cir.1978) (courthouse search); and *Downing v. Kunzig,* 454 F.2d 1230, 1232–33 (6th Cir.1972) (courthouse search).[12]

We believe that the rationale of these cases is not properly confined to the specific locations at issue therein. Searches were not conducted at those locations until the onset of airplane hijackings and courtroom violence presented a perceived need

for preventive measures to be taken. Where such a need is legitimately presented in another context, we do not believe that public authorities should be considered powerless to respond to it in an effective manner, or that such a need cannot legitimately be weighed in the constitutional balance in evaluating searches under the fourth amendment.

Rejecting a similar contention in a fourth amendment context, the Supreme Court said in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981): "Under appellees' view, new or emerging industries ... could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation. The Fourth Amendment's central concept of reasonableness will not tolerate such arbitrary results...." *Id.* at 606, 101 S.Ct. at 2542. So here, the recent vintage of the problem posed by hostile confrontations at Klan rallies in Connecticut should not weigh unduly in the balancing evaluation mandated by the fourth amendment's concept of reasonableness. *Compare Ingersoll v. Palmer,* 43 Cal.3d 1321, 1339–40, 241 Cal.Rptr. 42, 55, 743 P.2d 1299, 1311–12 (1987) (drunk driving checkpoints upheld against fourth amendment challenge, although technique too recent in origin for there to be meaningful statistics as to effectiveness).

On the other hand, the airport and courtroom cases have sanctioned only magnetometer searches in the first instance. In *Albarado,* for example, the recommended procedure was to have the passenger pass through a standing magnetometer, remove any metal objects if he activated the device, and pass through the magnetometer a second time before being subjected to a frisk. *Albarado,* 495 F.2d at 808–09. It was further suggested that a handheld magnetometer be utilized, if available, for the second

---

outside the rally site. Given the impracticality and enhanced intrusiveness of a general search of all spectators and the expressed intentions and history of the Klan as to firearms, however, a legitimate law enforcement purpose would be served by measures to prevent the introduction of weapons to the site itself, even in the absence of efforts to inhibit by searches the presence of firearms in all surrounding or adjacent areas.

12. The courthouse searches are particular applications of General Service Administration regulations relating to federal buildings in general. *Downing,* 454 F.2d at 1231. *See* 41 C.F.R. §§ 101–20.301 and 101–20.313 (1987).

sweep. *Id.* at 809. Although none of these procedures were mandated, the rule was stated in the following terms: *"the frisk* in the typical boarding situation we have been talking about *is to be used only in the last instance." Id.* (emphasis in original).[13]

*Albarado's* allowance of general magnetometer screening in the first instance without a warrant or probable cause, despite the fact that these screenings constitute fourth amendment searches, *see id.* at 803, was based upon the "great threat to hundreds of persons" posed by an airplane hijacking and the "absolutely minimal invasion in all respects of a passenger's privacy" occasioned by passing through a standing magnetometer. *Id.* at 806. As we there explained:

> The passing through a magnetometer has none of the indignities involved in … a frisk. The use of the device does not annoy, frighten or humiliate those who pass through it. Not even the activation of the alarm is cause for concern, because such a large number of persons may activate it in so many ways. No stigma or suspicion is cast on one merely through the possession of some small metallic object. Nor is the magnetometer search done surreptitiously, without the knowledge of the person searched. Signs warn passengers of it, and the machine is obvious to the eye.

*Id.*

■ A similar analysis is appropriate here. On balance, we agree with the district court that the indiscriminate patdown searches conducted here were excessive. As indicated earlier, we are not in total agreement with the analysis by which Judge Cabranes reached this conclusion. Nonetheless, taking into account the existing law, the weight legitimately to be accorded to Chief Klotz's testimony and the district court's findings based primarily thereon, the intrusiveness of these pat-down searches (even aside from those which defendants concede were excessive and improper), and the asserted primary purpose of the searches to eliminate firearms from the rally sites,[14] we agree with the district court's conclusion that the mass pat-down searches conducted at these Klan rallies went beyond the bounds established by the fourth amendment.

■ On the other hand, we cannot agree that an injunction requiring individuated suspicion or probable cause for all searches at future Klan rallies is required. Rather, we conclude that the injunction should allow magnetometer searches of persons and packages at such rallies,[15] followed by frisks where the magnetometer indicates the presence of metal and the situation cannot be resolved by use of the magnetometer alone. We do not see any general need for automobile searches, since it is usually practical to arrange for vehicles to be parked at a safe distance from the rally site, but we do not purport to provide a rule for all future contingencies and circumstances that may be presented to the district court.

We recognize that the primary focus of the proceedings below was the utilization of pat-down frisks, rather than magnetometers, but magnetometers were utilized at

**13.** The holding in *Albarado* was premised upon *"a constitutional requirement that to be reasonable the search must be as limited as possible commensurate with the performance of its functions." Albarado,* 495 F.2d at 806 (emphasis in original). As a general rule, this is undoubtedly no longer good law. *See, e.g., Illinois v. Lafayette,* 462 U.S. 640, 647–48, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (reasonableness of particular governmental activity does not necessarily or invariably turn on existence of alternative less intrusive means) (police station search), and cases there cited; *see also United States v. Sharpe,* 470 U.S. 675, 687–88, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) (question is not simply whether some other alternative was available, but whether police acted unreasonably in failing to recognize or pursue it) (pre-ar-

rest detention). Nonetheless, we agree with the district court, *see* 639 F.Supp. at 525 & n. 58, that the consideration of alternative means that might have been employed remains a legitimate factor in fourth amendment analysis.

**14.** As discussed below, we believe that this objective can be adequately addressed by less intrusive magnetometer screenings at Klan rallies.

**15.** In light of the fact that these rallies are usually held outdoors, and absent any expertise concerning such matters as power sources or the effect of weather on magnetometer operations, we express no view concerning the employment of standing, as against hand-held, magnetometers.

two of the rallies at issue in this litigation (Norwich, August 11, 1982, and West Haven, April 28, 1984), and the existing district court injunction would clearly preclude the use of magnetometers at future rallies for general screening of the attendees for firearms. In addition, when a post-judgment application to allow the use of magnetometers at a later rally was presented to the district court, the court denied that application. *See Wilkinson v. Forst,* 656 F.Supp. 710 (D.Conn.1986).[16]

The court's opinion in denying that application made clear, as we have just observed, that such use would violate the court's injunction. *See* 656 F.Supp. at 712. Although the Connecticut authorities on occasion discounted the effectiveness of magnetometers to deal with the situation presented by the Klan rallies, *see, e.g.,* Exhibit 246, pp. 85–87 (transcript of hearing on application for injunction relating to New Britain rally held June 25, 1983), that position was premised upon the inability of magnetometer searches to prevent the introduction of weapons other than firearms. In our view, however, the magnetometer searches are justified for the specific purpose of keeping firearms away from rallies, and reliance must be placed upon different techniques (adequate police, separation of hostile forces, site selection and preparation, etc.) to deal with other challenges to safety and order.

Given the entire record presented here, including the stated intention and practice of the Klan to bring firearms to their rallies, the fact that a multitude of rifles and shotguns were brought by Klan members to the Canterbury rally when no court order was in effect and no searches were conducted, and the continuing potential for violent confrontations at these events, we conclude that the injunction entered below should be modified so as to exclude from its prohibition general magnetometer screenings at future Klan rallies in Connecticut. In so holding, we note, as did the district court, 639 F.Supp. at 531–32, that more intrusive measures might be justified by future events.

We turn now to the award of nominal damages. The district court concluded that nominal damages should be awarded because the defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), and the defendants were accordingly not entitled to qualified immunity for their conduct. The primary basis of this ruling was that no case law authorized "indiscriminate searches so intrusive of personal privacy interests to be conducted in settings other than prisons, military bases, airports and other areas with special security concerns that cannot be adequately addressed through standard law enforcement techniques." 639 F.Supp. at 531.

■ With respect to defendants Forst and Long, we disagree. As indicated earlier, we do not give as much weight to the difference in sites as did the district court. We note, in addition, that applications were

16. No appeal was taken from that ruling, and such an appeal would undoubtedly have presented the magnetometer issue more squarely here. Nonetheless, we deem that ruling "sufficiently linked" to the judgment from which appeal was taken to warrant consideration here. *See SEC v. American Board of Trade, Inc.,* 830 F.2d 431, 436 (2d Cir.1987); *see also Conway v. Village of Mount Kisco,* 750 F.2d 205, 211 (2d Cir.1984) (notice of appeal construed broadly to reach order from which no appeal taken), *reaff'd,* 758 F.2d 46 (2d Cir.1985), *cert. granted sub nom. Cerbone v. Conway,* 474 U.S. 1100, 106 S.Ct. 878, 88 L.Ed.2d 915 (1986), *cert. dismissed as improvidently granted,* — U.S. ——, 107 S.Ct. 390, 93 L.Ed.2d 325 (1986); *Rebaldo v. Cuomo,* 749 F.2d 133, 137 (2d Cir.1984) (in proper case, appellate court will consider issue not raised below), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); and *San Filippo v. U.S. Trust Co. or New York,* 737 F.2d 246, 255 (2d Cir.1984) (doctrine of pendent appellate jurisdiction invoked to consider otherwise nonappealable issues), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). Based upon these authorities, in fact, we deem the magnetometer issue adequately presented by the appeal from Judge Cabranes' initial judgment, without reference to the later ruling, in view of the use of magnetometers at two of the rallies at issue in this litigation and the prohibition of their use at future rallies by the judgment on appeal.

made to the Connecticut courts for orders banning weapons at these rallies, such orders were obtained, and whatever their proper textual construction, the defendants were justified in an objectively reasonable belief that the court orders authorized most of the searches that were conducted.[17] Finally, and in any event, we do not deem the law applicable to the unique and difficult problem presented to the defendants by these historically unprecedented Klan rallies in Connecticut so adequately clear and settled as to warrant an award of damages under the rule of *Harlow v. Fitzgerald. See Sec. & Law Enforcement Emp., Dist. C. 82 v. Carey*, 737 F.2d 187, 210–11 (2d Cir.1984); *Sala v. County of Suffolk*, 604 F.2d 207, 209 (2d Cir.1979), *vacated on other grounds*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980).

■ We reach a different result, however, concerning the City of Meriden. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), holds that a municipality has no immunity from liability under 42 U.S.C. § 1983 (1982) based upon the good faith of its officers, even though those officers would themselves be accorded such immunity. *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), requires, however, that the action challenged as violative of section 1983 reflect the official policy of the municipality, and precludes liability based upon *respondeat superior. Id.* at 691–94, 98 S.Ct. at 2036–37. Since this issue has not been briefed or argued here, and was not considered below, we remand for its initial consideration by the district court.

Finally, we find no error in the district court's rejection of plaintiffs' fourteenth amendment claim respecting the timing of defendants' applications for court orders, especially since plaintiff Wilkinson explicitly testified that the Klan was in any event unable to obtain counsel to prosecute appeals from these orders and would not undertake appeals on a *pro se* basis. In addition, since the court below did not specifically decide plaintiffs' alternative claim that the challenged searches violate their first amendment rights, *see* 639 F.Supp. at 530 n. 62, we similarly do not decide that issue, although much that has been said in this opinion would obviously be relevant to its resolution.

### *Conclusion*

The judgment below, as to the injunction, is affirmed as to its prohibition of pat-down and automobile searches without reasonable suspicion or probable cause, but reversed amd remanded with the direction that it be modified to allow general magnetometer searches at the sites of future Klan rallies in Connecticut without regard to standards of reasonable suspicion or probable cause. As to the award of nominal damages, the judgment below is reversed with respect to Lester Forst and Donald Long, and reversed and remanded with respect to the City of Meriden.

---

17. The applications for state court orders pursued with respect to these rallies satisfied many of the concerns to which the traditional warrant requirement of the fourth amendment is directed. *See Almeida–Sanchez v. United States*, 413 U.S. 266, 270, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973). The Connecticut authorities might consider in the future seeking area search warrants, as well as court orders prohibiting weapons at the rally site and authorizing searches in general terms, as outlined in Justice Powell's concurring opinion in *Almeida–Sanchez. Id.* at 283–85, 93 S.Ct. at 2544–45 (Powell, J., concurring). The four justices who joined in the majority opinion were divided as to the constitu-

tionality of such warrants, *see id.* at 270 n. 3, 93 S.Ct. at 2538 n. 3, and the four dissenters agreed with Justice Powell that they were constitutionally valid. *See id.* at 288 (White, J., dissenting). *See also United States v. Martinez–Fuerte*, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); *United States v. Ortiz,* 422 U.S. 891, 897 n. 3, 95 S.Ct. 2585, 2589 n. 3, 45 L.Ed.2d 623 (1975); and *United States v. Jackson*, 825 F.2d 853, 862–64, (5th Cir. August 17, 1987) (in banc), *but see id.* at 872 (Clark, C.J., specially concurring), 6203 (Garwood, J., concurring), 6204 (Higginbotham, J., specially concurring), and 6209 (Hill, J., specially concurring).