**Bill WILKINSON and James Farrands**

**v.**

**Lester FORST, Commissioner of Public Safety for the State of Connecticut at certain times relevant hereto, individually and in his official capacity; Donald Long, Commissioner of Public Safety for the State of Connecticut at certain times relevant hereto, individually and in his official capacity; Austin McGuigan, Chief State's Attorney for the State of Connecticut at all times relevant hereto, in his official capacity; and the City of Meriden.**

**Civ. No. H–80–755 (JAC).**

United States District Court,
D. Connecticut.

May 22, 1989.

50

Philip D. Tegeler, Martha Stone, Connecticut Civil Liberties Union, Hartford, Conn., for plaintiffs.

Carl J. Schuman, Asst. Atty. Gen., Hartford, Conn., for defendants.

## RULING ON APPLICATION FOR MODIFIED INJUNCTION

JOSÉ A. CABRANES, District Judge:

This matter is before this court as a result of a remand by the Court of Appeals, *see Wilkinson v. Forst*, 832 F.2d 1330, 1342 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1593, 99 L.Ed.2d 907 (1988). On June 30, 1986, this court held that weapons searches at rallies of the Ku

Klux Klan violated Klan members' Fourth Amendment rights, and the court enjoined state police from conducting such searches at future Klan events in the absence of individualized suspicion or probable cause. *Wilkinson v. Forst,* 639 F.Supp. 518 (D.Conn.1986). This court later denied a post-judgment application to permit use of magnetometer searches for weapons at Klan rallies. *Wilkinson v. Forst,* 656 F.Supp. 710 (D.Conn.1986).

On the appeal of the state officials, the Court of Appeals affirmed the injunction against pat-down and automobile searches without reasonable suspicion or probable cause, *Wilkinson v. Forst,* 832 F.2d at 1340, but reversed and remanded with a direction to modify the injunction to allow general magnetometer searches without regard to standards of reasonable suspicion or probable cause, *id.* at 1342. The Court of Appeals directed that the modified injunction "should allow magnetometer searches of persons and packages at such rallies," *id.* at 1340, but expressed "no view concerning the employment of standing, as against hand-held, magnetometers," *id.* at 1340 n. 15. While indicating that automobile searches without individualized cause should not be necessary in the circumstances presented, the Court of Appeals noted that it did not "purport to provide a rule for all future contingencies that may be presented to the district court." *Id.* at 1340.

Evidentiary hearings on this matter were held September 27, 1988, October 13, 1988, and January 13, 1989, and final arguments were heard on May 12, 1989. The record of this case also includes exhibits submitted at the hearings and supplemental affidavits,[1] along with proposed orders regarding magnetometer use from each side.[2]

In the hearings in this matter, the parties agreed that the questions before this court are (1) when magnetometer searches may be used, and (2) what procedures should be followed when such searches are used, that is, in particular, when "portal" or "walk-through" magnetometers should be used and when use of hand-held magnetometers is appropriate.

## DISCUSSION

By the time of the final oral argument in this matter on May 12, 1989, the parties had effectively reached substantial agreement regarding magnetometer procedures.[3] The two remaining points of significant disagreement between the parties are: (1) what form of court order or authorization would be required to permit magnetometer searches of rally-goers; and (2) whether "first use" of hand-held, rather than portal, magnetometers should be prohibited.

### I. Court Authorization

Plaintiffs urge that magnetometer searches should be permitted only after both a court order prohibiting dangerous weapons and firearms at the rally site *and* an application thereafter to a federal court for an additional order allowing the use of magnetometers. Plaintiffs argue that defendants should be required to seek a form of "warrant" from a federal court before the defendants are authorized to conduct magnetometer searches of demonstrators entering rally sites where weapons have been banned.

The ruling of the Court of Appeals appears to assume, and the parties do not dispute, that a weapons ban for a Klan rally site would be issued by a state court

1. *See* Affidavit of Ronald T. Voog (filed Oct. 5, 1988) ("Voog Affidavit"); Affidavit of Captain William N. Smith (filed Oct. 5, 1988); Affidavit of Richard J. Gigliotti (filed Feb. 13, 1989); Affidavit of David D. Eiserman (dated Mar. 20, 1989, and filed as Exhibit B to Plaintiffs' Brief in Support of Proposed Order Governing Magnetometer Use (filed Mar. 22, 1989) ("Plaintiffs' Brief")).

2. *See* Plaintiffs' Proposed Order Regarding Magnetometer Use, filed as Exhibit A to Plaintiffs'

Brief ("Plaintiffs' Proposed Order"); Defendants' Proposed Order Regarding Metal Detector Use, attached to Post–Trial Brief of the Commissioner (filed April 5, 1989) ("Defendants' Proposed Order").

3. At oral argument on May 12, 1989, the parties indicated agreement regarding the following paragraphs of this court's Order Regarding Magnetometer Use (filed May 22, 1989) (Appendix A): 2(d), (e), (f), (g), (h), (i), (j), and (k).

where public authorities presented evidence of a need for preventive measures. 832 F.2d at 1339. The Court of Appeals stated that magnetometer searches are *prima facie* permissible where there is evidence of the intention and practice of the Klan to bring firearms to their rallies along with the established potential for violence at such rallies. *See id.* at 1341.[4] The defendants agreed at oral argument on May 12, 1989 that weapons bans for Klan rallies would be sought by public authorities on a rally-by-rally basis and would be based on demonstrations of the potential for violence at a given rally.[5]

 Under the ruling of the Court of Appeals in *Wilkinson v. Forst,* a state court order banning firearms and dangerous weapons from a particular rally site, when based on specific findings of an articulable suspicion of violence at the rally, is sufficient to permit magnetometer searches of persons and packages at the rally in question. *See* 832 F.2d at 1341 ("Given the entire record presented here, including the stated intention and practice of the Klan to bring firearms to their rallies ... and the continuing potential for

violent confrontations at these events, we conclude that the injunction entered below should be modified so as to exclude from its prohibition general magnetometer screenings at future Klan rallies in Connecticut."). In effect, the state court's determination that a scheduled rally will be attended by opposition groups who have historically clashed with the sponsoring organization, that there is evidence that the rally could erupt into violence, and that weapons should be banned at a Klan rally site would constitute sufficient authority for state law enforcement authorities to conduct magnetometer searches at that site.[6] This court is not persuaded that any particular competence or expertise of the federal courts requires that such authority be issued by federal courts, as plaintiffs urged at oral argument on May 12, 1989. Nothing in the decision of the Court of Appeals, or in general principles of federalism, suggests that it is either necessary or appropriate in these circumstances for a federal court to hover over a state court that in presumed good faith seeks to discharge its responsibilities under the United States Constitution and relevant law, in-

---

**4.** The Court of Appeals noted:

Defendants are *not* contending that they have the right to conduct blanket searches at all political rallies or at all political rallies where violence is anticipated, *or at all Klan rallies or functions.* Rather, they maintain that when an organization with a historically demonstrable penchant for violence plans a rally which is to be attended by opposition groups who have historically clashed with the sponsoring organization, *and* public authorities obtain information that both sets of groups anticipate violence, those authorities, who have a duty to provide protection and maintain order at such rallies, may conduct pat-down searches of all those attending the rally.

832 F.2d at 1337–38 (emphasis added).

**5.** The Court of Appeals noted, and the parties do not dispute, that a court-ordered weapons ban is a prerequisite to any use of magnetometers, since the possession of guns and knives at rally sites generally is not otherwise unlawful in Connecticut. *See* 832 F.2d at 1333 & n. 6.

**6.** In reversing a nominal damages award against the present and former Commissioners of Public Safety, defendants Forst and Long, the Court of Appeals indicated that the defendants

were justified in an objectively reasonable belief that the court orders banning weapons at the rally sites authorized the pat-down searches that were conducted. 832 F.2d at 1342. The Court of Appeals suggested that the public safety authorities "might consider in the future seeking area search warrants, as well as court orders prohibiting weapons at the rally site and authorizing searches in general terms, as outlined in Justice Powell's concurring opinion in *Almeida–Sanchez.*" 832 F.2d at 1342 n. 17 (citing *Almeida–Sanchez v. United States,* 413 U.S. 266, 283–85, 93 S.Ct. 2535, 2544–46, 37 L.Ed.2d 596 (1973) (Powell, J., concurring)).

Plaintiffs argue that nothing in the Court of Appeals' decision abrogates the Fourth Amendment principle that a fact-finding hearing should be held prior to the issuance of a judicial order authorizing a search. Plaintiffs are correct that a hearing must be held prior to each rally at which magnetometer searches are contemplated and that authorization for such searches must be based on event-specific factual findings regarding the likelihood of violence. Such hearings and findings, however, are properly the responsibility of the court receiving an application from the state authorities for an order to ban weapons at a rally site.

cluding directives of our Court of Appeals.[7]

## II. Use of Hand–Held Magnetometers

■ Plaintiffs argue that defendants should not have the discretion ever to use hand-held magnetometers in the first instance when magnetometer searches of persons entering a rally site have been authorized. Plaintiffs do not object to the use of hand-held magnetometers as a supplement to the free-standing magnetometer after the presence of metal has been detected; indeed, the parties are in substantial agreement regarding general magnetometer procedures.[8] However, plaintiffs argue that first-instance use of hand-held magnetometers should be prohibited because there is "never any need to use hand-held magnetometers first." Plaintiffs' Brief at 8. Defendants respond that it is "not possible for this Court to say that free-standing metal detectors will always work in all conditions or that the remedial measures suggested by the Klan are rea-

sonable under the circumstances." Post–Trial Brief of the Commissioner at 14.

It is not seriously disputed, and this court finds, that a walk-through or portal magnetometer search is much less intrusive than a search with a hand-held magnetometer.[9] Further, portal magnetometer searches would promote security at rallies, principally because hand-held magnetometer searches are more prone to operator error.[10] Finally, portal magnetometers can be effectively employed in nearly all conditions and environments.[11] Accordingly, portal magnetometer searches should be used in the first instance in all reasonably foreseeable circumstances.[12]

Nonetheless, it does not seem either appropriate or necessary for this court to issue a blanket prohibition of all first-instance use of hand-held magnetometers. Under unexpected and extraordinary circumstances, including, for example, equipment failure of all available walk-through magnetometers, the public authorities implementing a court-ordered weapons ban

---

7. This court need not consider hypothetical questions regarding the possible availability of a federal court to consider questions arising under federal law in circumstances such as those presented in this case as a result of action by state authorities, including state courts.

8. See supra note 3; see also Order Regarding Magnetometer Use (filed May 22, 1989) (attached as Appendix A).

9. A search with a hand-held magnetometer requires that the person being searched assume a physical stance approaching "spread eagle." See Official Transcript, Segment I (filed Oct. 4, 1988) ("Tr. I") at 41 (testimony of plaintiffs' expert, David Duane Eiserman); Official Transcript, Segment II (filed Oct. 31, 1988) ("Tr. II") at 111, 135 (testimony of defendants' expert, Richard J. Gigliotti); Official Transcript, Segment III (filed Feb. 1, 1989) ("Tr. III") at 169–70 (rebuttal testimony of plaintiffs' expert). A hand-held magnetometer search also requires close proximity to the body of the person being searched. Tr. I at 41–42; id. at 66 (during search, hand-held magnetometer often will touch person being searched); Tr. II at 141 (same); see also Tr. II at 132-33 (for search on woman wearing skirt, hand-held metal detector would have to be placed "as close as possible" to front and back planes of body). See generally id. at 140 (to general public, hand-held magnetometer search is more intrusive than walking through portal magnetometer).

10. See Tr. I at 36–37 (testimony of plaintiffs' expert); Tr. II at 98, 110, 138 (testimony of defendants' expert). Hand-held magnetometer searches take much more time than do portal searches, see Tr. I at 35–36; Tr. II at 96–97, and operator error is more likely when operators are attempting to proceed quickly, see Tr. I at 37. The court also heard testimony that free-standing magnetometers are electronically and mechanically more reliable than hand-held magnetometers. Tr. I at 38.

11. The court especially credits the testimony of plaintiffs' expert, retired Secret Service security specialist and training officer David Duane Eiserman, who has extensive experience in planning and supervising magnetometer weapons searches at outdoor rallies. Mr. Eiserman testified that in his experience of approximately thirty-five outdoor rallies, see Tr. I at 17–18, he had never found a location where a free-standing magnetometer could not be used, see Tr. I at 59.

12. Cf. United States v. Albarado, 495 F.2d 799, 806–09 (2d Cir.1974) (discussing airport magnetometer searches and holding on general principles that to be reasonable, search must be as limited as possible commensurate with the performance of its functions and that more intrusive search method is to be used only in last instance).

should have the discretion to conduct hand-held magnetometer searches in the first instance.[13]

### III. Additional Points in Dispute

■ Plaintiffs' proposed order would require defendants to purchase items on an extensive list of equipment and to conduct specific training and consultation on magnetometer use prior to any Klan rally.[14] Although it is arguable that an order including such measures is within the equitable power of court in fashioning an injunctive remedy, this court will decline in these circumstances to issue a mandatory injunction that regulates in detail the training and procurement practices of state law enforcement agencies. Defendants' obligations under the modified injunction are clear, and this court will not assume that defendants will fail to prepare to meet those obligations in the absence of a detailed supervisory order of this court.[15]

■ Finally, the proposed orders diverge on the question of the notice to be provided when the defendants seek a weapons ban for a rally or seek to modify this court's order.[16] If and when the defendants seek any court orders relevant to this matter, simple fairness and orderliness require that the defendants provide plaintiffs and their current counsel with reasonable notice of their intention to seek an order—notice reasonable under the particular circumstances that are presented—prior to any hearing on defendants' application.[17]

---

**13.** Although defendants have urged that certain extreme conditions of weather or terrain would make use of portal magnetometers impractical or impossible, *see* Tr. II at 101–07, 117–29 (testimony of defendants' expert regarding impracticality of outdoor use of portal magnetometers), their counsel conceded at oral argument on May 12, 1989 that in most circumstances the public authorities would have no problem using portal magnetometers. This court is satisfied that anchoring, use of heaters, use of tents, and other reasonable measures can ensure the operation of portal magnetometers under nearly all circumstances. *See* Tr. I at 43–44, 46–47, 57–59, 64, 66–67; *see also id.* at 51 (plaintiffs' expert testified that he "can't think of any situation ... where a stand-up magnetometer could not be accommodated").

### CONCLUSION

On the basis of the full record of this case and pursuant to Fed.R.Civ.P. 52, the court enters the foregoing findings of fact and conclusions of law and hereby modifies the injunction entered by this court on June 30, 1986, as detailed in the Order Regarding Magnetometer Use (filed May 22, 1989), a copy of which is attached hereto as Appendix A.

It is so ordered.

### APPENDIX A

United States District Court

District of Connecticut

May 22, 1989.

### ORDER REGARDING MAGNETOMETER USE

WHEREAS on June 30, 1986, this court entered judgment in the above-captioned case, *see* 639 F.Supp. 518 (D.Conn.1986); and

WHEREAS on August 22, 1986, it entered a separate order regarding magnetometer use, *see* 656 F.Supp. 710 (D.Conn. 1986); and

WHEREAS on November 7, 1987, the United States Court of Appeals for the Second Circuit directed that the order entered at 639 F.Supp. 518 (D.Conn.1986) be reversed in part and remanded the cause to this court for the purpose of modifying that order to permit general magnetometer searches and to determine procedures for

---

**14.** *See* Plaintiffs' Proposed Order ¶¶ 2(i)–(n).

**15.** The court notes that state law enforcement authorities have represented that free-standing magnetometers located in various Connecticut state courthouses would be made available to the Connecticut State Police on days when court is not in session. Voog Affidavit at ¶ 4.

**16.** *Compare* Plaintiffs' Proposed Order ¶ 2(*o*) *with* Defendants' Proposed Order ¶ 9.

**17.** By restating the process due, the court neither assumes nor requires that the plaintiffs' current counsel will continue to represent the plaintiffs.

magnetometer use, *see* 832 F.2d 1330 (2d Cir.1987); and

WHEREAS this court has held extended evidentiary hearings following the remand by the Court of Appeals and has entered additional findings of fact and conclusions of law, *see* Fed.R.Civ.P. 52, in a Ruling on Application for Modified Injunction (filed May 22, 1989), pursuant to which this Order is entered;

NOW THEREFORE BE IT ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

1. At any future rallies of the plaintiff Ku Klux Klan, for which defendants have sought and obtained a state court order prohibiting dangerous weapons or firearms, defendants may employ magnetometer searches of demonstrators entering the rally area to implement the court-ordered weapons ban. *See* 832 F.2d at 1340.

2. Magnetometers shall be used under the following conditions:

 a. Free standing "walk-through" or "portal" magnetometers shall be used in the first instance. Hand-held magnetometers may be used in the first instance only under extraordinary circumstances.

 b. Defendants shall take appropriate steps to ensure the availability and operability of free-standing magnetometers to implement a court-ordered weapons ban.

 c. In the event of inclement weather, defendants shall take appropriate steps to ensure the continued operation of the magnetometer, including but not limited to covering the electronics boxes on freestanding magnetometers with plastic rain covers and securing magnetometer bases to protect the equipment from winds.

 d. Free-standing magnetometers shall be placed more than ten feet from any moving vehicles and more than six feet from fluorescent lights.

 e. Except under the unforeseen and extraordinary circumstances noted in subparagraph (a), hand-held magnetometers may be used only if the alarm on the free-standing magnetometer has been activated twice, that is, on two "walkthroughs," and the rally-goer has had the opportunity to remove all metal objects from his person.

 f. Each rally-goer shall be informed, orally or in writing, prior to each magnetometer search, that he may leave the rally site rather than submit to a magnetometer search.

 g. Frisks or pat-down searches based solely upon activation of the magnetometer shall be conducted in the last instance and only after the procedures above have been followed, where the hand-held magnetometer still indicates the presence of metal, the person has been given an additional opportunity to remove all metal objects, and the situation cannot be resolved by the use of the magnetometer alone.

 h. Each person subject to a frisk triggered by the magnetometer shall be informed orally that he may leave the rally site rather than submit to a frisk.

 i. Nothing in this Order shall be construed to prevent the defendants from performing other lawful law enforcement activities, including frisks based on individualized reasonable suspicion, arrests based upon probable cause, searches otherwise permitted by law, and execution of legal process.

 j. All free-standing and hand-held magnetometers shall be pre-set and calibrated so as not to register less than a sample solid package of two ounces of ferrous or non-ferrous metal.

 k. Defendants shall utilize an adequate number of metal detectors and personnel so as to avoid unreasonable delay in the entry of persons into the rally site or equipment malfunction.

3. If and when defendants decide to seek a court order to ban weapons at a Klan rally or to seek any modification of this Order, defendants shall provide plaintiffs *and* their current counsel, the Connecticut Civil Liberties Union, with reasonable notice of their intention to seek any such order prior to any hearing on defendants' application.

This Order constitutes an amendment to this court's order of June 30, 1986, as amended by this court's order of August 22, 1986. The court's order of August 22, 1986 is vacated.

It is so ordered.

Dated at New Haven, Connecticut, this 22d day of May, 1989.

/s/ José A. Cabranes
José A. Cabranes
United States District Judge